Mr. Sing was charged with transmitting, or possessing with the intent to transmit, five individual schematics for isolated components within his former employer's flight display products. At trial, the government's evidence concerned the complete sets of schematics which were transmitted, but not charged, for those products. And so one of two errors necessarily occurred. Either the government proved its case with respect to value by a constructive amendment of the indictment, or it failed to prove its case at all. And so this morning I plan to focus on the sufficiency argument, although I'm happy to answer whatever questions you have about the other two claims. Under the Economic Espionage Act, in order to be a trade secret, something has to derive independent economic value from being secret. And even viewing it in the light most favorable to the evidence, to the government, the evidence failed to prove that with respect to the schematics that were charged in this case. There are Transmitted all of them, but they didn't charge all of them. So right? Correct. So of the ones they charge, you can't put that together and create a usable device? That's correct, Your Honor. Okay, but what about your client's testimony, that what he transmitted had value? And you know the passage I'm talking about, where he was just talking about the one diagram, 7A. Yes. It's at GER 58788. Yes. Your Honor, there are several places in the testimony where Mr. Singh and the defense expert, Noe Martinez, testified that an individual's schematic had value. And I think the distinction to be made is between something having value in a general sense, and many things have value, and value in the sense that it's defined under the statute, and that is economic value by virtue of being secret. So the fact that an employee works on something means that that provides value to the company, and I think that was the point that Mr. Singh made, and he actually clarified. He said, this has value, but it's value to the company. He did say that in his testimony. It's a little hard to parse out his testimony, but he does ultimately say that, but he also said in the readme document that was transmitted to the competitors, quote, the manufacturer copies the hardware design across every single product while only changing the software. Only the software changes. Order their products and reverse-engineer the design. You should have enough information to figure out how they do it. So it sounds to me like your defense is that it's certainly a technical one, but for his best efforts, he didn't commit espionage. I mean, he did transmit all of the documents. You're just talking about a, and I'm not trying to give you a hard time, but I want to make sure I understand this argument. I think the government could have charged a different case here. All right. So, so fair enough. So I think the answer to my question is yes. He transmitted all of them, and you're not contesting that with all of them, an individual on the receiving end could have reverse-engineered the whole package. That's correct. A usable device that would have value. I'm not contesting that. All right. So, but they charged some subpart of that, and your contention is that what, that those components did not have value, standing alone. That's correct. So each count alleged the transmission of a trade secret, and that trade secret has to be a trade secret as defined under the statute. If the government had alleged in each count the transmission of all the schematics for a particular product, that would have been a different situation. But what the government charged and what the grand jury signed off on in the indictment was that this one schematic, one out of 18 for one product, one out of 13 for another product, this one individual schematic was a trade secret, which means that that schematic had to have independent economic value. Right. So the argument is, and I appreciate that, you've articulated it well, both in your briefing and here, but it was sort of treated as something of value. He had to sign confidentiality agreements. The competitors immediately recognized this was a problem and contacted his employer, right? What about the argument that even components, pieces of the entire, I'll say device because it's easier, would give a competitor a serious head start at competing to make the same product and, or would allow a competitor to participate, to compete for the market to repair the product? I think there are kind of two parts to your question. And the first that I'll make is that the fact that the competitor recognized, oh, this is a big deal. I mean, they got all the schematics, so that is a different situation than what was charged. And I think with respect to Your Honor's second question about whether a single schematic could help a competitor, there was no evidence about that. And that's the problem in this case, is that the evidence about competitive harm to Mr. Company was evidence about somebody entering the repair market, which they couldn't do if they had one schematic, about them producing a product. Why couldn't they do that if they only had some of the schematics? I mean, there's no question they got more than one, but... Well, more than one was charged. I don't know whether they could or not, but the evidence, there is no evidence that they could. And it was the government's burden. Why couldn't the jury decide? Why couldn't the jury decide since there was no contest that the entire, the whole enchilada was conveyed and that it had value? Why couldn't the jury use common sense and recognize the competitors? This would give a competitor a serious head start if they wanted to reverse engineer the entire product. Well, the evidence, the testimony was that reverse engineering is difficult even if you have everything. Four out of the five of these products had been discontinued, were for helicopters that had been discontinued. So I think it's a stretch to think that anybody would have tried to reverse engineer this even if they had everything. But there was no evidence presented at trial that anybody would be tempted or inclined or able to reverse engineer a product if it had one of these things. And there's no evidence about the time that would be saved. Right. And so my question is, and again, I'm not trying to give you a hard time. I'm wondering, this is really a question, why would the jury have been prevented from using their common sense to reach that conclusion? This is a sufficiency of the evidence argument. We view everything in light most favorable to the government. Right. I think because of the testimony about what it takes to do a repair, for example, what it takes to reverse engineer. Okay. So where should I look in the record to see that? So I think it was, so Larry Smith, who's the president at ER 360 said that even if someone He said at ER 346, schematics are necessary for repairs because you need to understand the inputs to the cards, the outputs to the cards. Noe Martinez testified that you have to understand how things are connected in order to do repairs. I just said jury, right? It was a bench trial. And it's a bench trial, right? Okay. So insert fact finder. I think your answer doesn't change. I've read Larry Smith's testimony and you think it falls short. Is there other testimony I should read? There is. The Larry Smith and ours are the two people who really primarily, and I think it was ours who said at ER 442 that you need the schematics to do repairs because, and this is a quote, you have to trace the fault through the unit. So you have to be able to, you know, something's wrong with the unit. You don't know what it is. If you just have the schematics for one of the circuit boards in there, you're not going to be able to troubleshoot. You're not going to be able to trace it through the unit, and you're going to have, you know, no basis to enter the repair market, particularly for helicopters that are on their way out. Did you want to save some time? I do. Okay. Thank you. Good morning, Your Honors, and may it please the Court. I'm Ryan White for the United States. As the Court is well aware, defendant's principal claims on appeal or claim on appeal is that the District Court violated Federal Rule of Criminal Procedure 12D, as well as another claim about a constructive amendment. I am here to assist the Court with any questions you may have. What's your strongest evidence of value? So we'll move to sufficiency. Strongest evidence of value, I would point the Court to the District Court's opinion at 27 to 28 in the ER, as well as the government's answering brief at 51 to 57. Okay. Hold on, hold on, hold on. Sorry. The order at what? 27 to 28. Okay. That is Judge Sander's order, findings of fact, as well as the government's answering brief at 51 to 57, because I would submit that the government's evidence was quite legion in this case of value and came from a number of witnesses throughout the record. But I can point the Court to a variety of ways that the government proved value. Well, many of them do fall short, or at least they get wobbly, when one takes into account that I think all of the component, all the schematics were conveyed, but only a handful charged. Can I answer that in two parts, Your Honor? Sure. First, I want to clarify for the record that it is not the case that for every product we're talking about, the 427, DAU, and DU, the 430, that every single schematic for every circuit board was transmitted. It is the case that... Okay. But that doesn't make your case better. It makes it... No, it doesn't. But I wanted to clarify because of something that the Court seemed to be under a misimpression that, you know, all of the schematics were transmitted. I was. And I think I tried to clarify that when opposing counsel, actually. But... I simply want to make that... I think that makes your case harder. So I appreciate the clarification. I'm here for candor, Your Honor. So I just wanted to make that clear. Appreciate that. There is at least one product, and I can't remember which one, where every circuit board schematic was transmitted, but the others, the majority were transmitted, but not every single one. Okay. So I appreciate that clarification. What's your best evidence of that? That also explains why the government, in many ways, charged the case the way it did. We believe that each schematic itself charged in the case is a trade secret. It may also be the case that the entirety of the product is a trade secret, but that was not the way the government charged the case, and that was not the way the government proved the case. Okay. So it's not that we haven't read the order appealed from, and you just gave me 51 through 57. It's a broad page range. That is the government's answer in brief, right. The district court's opinion at 27 to 28, and I'll walk the court through a variety of ways that the government proved this. First, the government introduced substantial evidence about each of the charge schematics themselves, each of the seven charge schematics, and that's at GER 185 to 216. That's in the testimony of Chief Hardware Engineer Jeffrey Owers. There, he explained each of the schematics page by page, how they work, what the circuit board does that the schematic pertains to, what each page of the schematic does on that circuit board, and then so we have evidence about each of the charge schematics and what they do vis-a-vis each circuit board. He also testified about how schematics are made, that schematics typically take two engineers approximately two to three months to engineer, and that from there, it takes approximately one year to create a circuit board that has passed all testing, heat requirements, as well as all FAA and other certifications that... I appreciate that, but that tells me it would take a competitor... How do you get to value, that a whole lot of effort, time, money, and effort would have to go into recreating them? So that's part of it. Courts have looked at a variety of metrics for value. One is, what was the effort, time, and labor that went into development of it? Another is, would the trade secret, or alleged trade secret, give somebody who received it a window into how the victim designs their product? Here the Chung case, as well as the Trandis case, I think the underlying... Chung is a Ninth Circuit case, Trandis, I think, is a Fourth Circuit case. The underlying principle there is that even wage and hours documents pertaining to an antenna on a space shuttle, even if there's no market for it, it would give a competitor a window into how the victim designed their product. Well, the README document does that. The README document does that, and certainly encourages the competitors to do precisely that. There is testimony of Jeffrey Owers, as well as testimony of Noe Martinez, the defense's own witness, that talks about, if you receive a schematic, you can learn a lot about a circuit board that you could not simply learn from looking at a circuit board itself, given how circuit boards are designed and the multiple layers that they have. You can see part numbers, you can see electric values, you can see pathways. All of these, while in and of themselves, maybe not particularly special, in the context of a board that has taken a year to develop, millions of dollars to develop, and that it has passed stringent testing requirements for extreme conditions, as well as certifications, that could give a competitor a window into what is the special sauce that Rogers and Kratos has to give it a competitive edge in the marketplace. And it did have one. Contrary to what defense counsel argued below and on appeal, Rogers and Kratos was a very large company, had a very robust business, and it differentiated itself from its competitors in that it provided customization. Its competitors, like Garmin, provided sort of off-the-shelf, box, plug-and-play, plug-it-in, to the extent you can have plug-and-play in an aircraft, but plug-and-play off-the-shelf. Rogers and Kratos designed its products so that they could be replicated across their product line, and they could be customized according to the particular- What the products themselves would be. So for example, the 427DAU, it could be smaller, it could be bigger, it could handle more heat or in colder environments, depending on what type of helicopter Bell needed it to go into. Okay. I have a question about his defendant's testimony at ER 217. The question was, so what does that tell about the value of the electronic information contained in the schematic 7A? Sure. Right? His answer. Well, there's always value in something like this, all right? But it's value to the company, I think meaning to his employer. To Rogers and Kratos is how I would interpret it. Right. And even the company that I used to work for, they don't even know how to do this design. This detailed, specific design is a secret that nobody knows but me. It's not found anywhere, and you can't interpret it from looking at the schematics. It's impossible. Then, there was another question, and he said, well, they might be able to replicate it by looking at the schematic, but they won't understand the detailed design process, and that's where, if there's anything, that finite mine of information, you can't get that from looking at the schematic. That's what could be of value. I didn't understand the last testimony. How do I interpret that? I think he essentially concedes the government's case that the schematics provide valuable information that you can't learn from a circle board. Well, her response, of course, is that's what you get when you first read it, right? But then he says it's only value to the company, and then he says he's the only one who could interpret it, which seems to be quite contrary to the README document, I'll give you that. But this second part on page 218, is there other testimony in the record somewhere where I could understand what he's talking about here? So again, a two-part answer. First, I will situate your Honor in my observations of the defendant at trial. His perception was always that he knows more than everybody else, that he adds value in a way that nobody at the company could add value, which is why he created the mugs and disseminated them and thought everybody were imbeciles, and part of the reason he got fired. So the testimony that you just cited, sure, there's value in this, but I'm the only one who knows it. I'm the only one who could figure it out. I just wanted to sort of put that in context, that I think that is where that's coming from, and I'm not sure the Court, your Honor, or any of your Honors, should give too much credence to that particular statement. Well, that's what your brief tells me, that he had that view of his co-workers. Was he cross-examined with the README document that says you should be able to read for his engineer? Oh, I'd have to go back and re-read the testimony. I can't recall. My colleague did that cross-examination, and I apologize for that. I would want to point the Court, though, to the defendant's acknowledgments in their cases that say, I think it's Lange out of the Seventh Circuit, that says, well, one of the factors we look at is the defendant's own acknowledgment of value, but we can't only hang our hat on what the defendant says. We certainly, as the government, would never do that, and certainly not in this case. I think, you know, I've pointed the Court to other witnesses that point to value. Noe Martinez, the defendant's own expert, testified that each of the charge schematics had value. He testified that... To whom? To whom? He said, well, he didn't say to whom. He said they had value by virtue of the fact that when you work on a schematic, you develop it and it's unique to a specific part, and that enhances its value. Implicitly, I would submit, that means it is value to the company, which is what the government has to prove, that it derives independent economic value, actual or potential. Counsel. Am I over? You're not letting my colleagues get a chance to get a word in. I apologize. That's all right. I think they have questions. Oh, I'm wrong. Sorry. They don't have questions. They look fidgety. Well, whenever I get the neck cut off, I will stop. No, no, no. That's my fault. That's my fault. Go ahead and finish. Go ahead and finish, please. When the trap door opens, you should be good to go. I will walk right into it. I'm very sorry. Go ahead and please finish your thought. You needed to prove value to the company, you were saying. We need to prove value to the company, actual or potential, and I believe we did that in spades through a variety of ways. I don't... I'm not going to recite further because they're in the brief. I pointed, Your Honors. to those record sites. I did want to open it up now. We have not even addressed his other two arguments. If the court wants me to address them, I'm more than happy to and able to, but if you do not, I will submit on that. Not on my account. I guess not. All right. Thank you, Your Honors. Thank you. Thank you very much for your helpful argument. Counsel? I just want to try to make two points since I have a minute and a half left. The first has to do with this idea of general insight into design processes as a basis for value being derived from these individual schematics. And the problem with that is that the only testimony about that sort of general insight failed to specify any actual information or actual insight that could be gained from these schematics. So Martina said you could look at the schematic and see if it matches some of the things. That's what he said about this sort of general insight. Smith said you could look at how Rogers and Kratos designs and gain ideas. But in Chung, for example, which counsel pointed out, the court found specific information about the number of antennas, about the way that that company performed different tasks that could be gleaned from those documents. And there is no such information that was ever identified at trial here. And then the only other thing that I want to point out is that if you look at all of the cases cited in the briefing, and there are many about trade secrets, any case in which a court found that there was a trade secret, the court identified an actual benefit to the competitor or potential benefit to the competitor. And that's in Adivere regarding the repair manuals that would allow a repair shop to actually certify that it was doing the repairs properly. In Lange, it was all the information required to obtain certification. All of these cases, it would allow the competitor to compete. And that wasn't proven here with respect to these schematics. Could you just correct me, because I think we miscommunicated earlier. I'm sure the fault is mine. But I want to just revisit. On the thumb drive that was communicated to the competitors, were there any products for which all the schematics were conveyed? There was one product. And I believe that it was the product for the CHI. Okay. And for the other products, only part of the set of schematic was conveyed. Is that right? Correct. I think for all of them, it was most of the schematics. Thank you. Thank you. Thank you both. Thank you. We'll go on to the next case on the calendar. Harlott v. Hatton.
judges: Clifton, Christen, Rufe